**The NATIONALIST MOVEMENT,**
**Plaintiff**

**v.**

**CITY OF YORK Defendant**

**No. Civ.A.1:CV–02–1917.**

United States District Court,
M.D. Pennsylvania.

March 24, 2006.

Richard Barrett, Learned, MS, for Plaintiff.

Donald B. Hoyt, One Marketway West, York, PA, James D. Young, Lavery, Faherty, Young & Patterson, P.C., Harrisburg, PA, for Defendant.

### MEMORANDUM AND ORDER

KANE, District Judge.

Before the Court are cross motions for summary judgment. (Doc. Nos. 38 and 50.) Having been fully briefed and heard on oral argument, the motions are ripe for disposition.

### I. Background [1]

York Ordinance No. 10 ("York Ordinance"), adopted on April 16, 2002, amend-

---

1. The following are undisputed facts unless otherwise indicated. (Doc. Nos. 40, 53, 59,

ed Article 741, § 741.03 "Public meetings" of the Codified Ordinance of the City of York, Pennsylvania, to establish a permit requirement for the use of public land and facilities in the City of York. (Attached hereto as Appendix A.) The York Ordinance prohibits persons from conducting any public assembly, parade, picnic, or other event involving more than twenty-five individuals without first obtaining a permit. (Doc. No. 14, Ex. A, York Ordinance § (c); § 741.03(c).)[2] Permits may be obtained by filing a written application for a permit with the Recreation and Parks Bureau. (York Ordinance § (d)1(1); § 741.03(d)(1)A.) "Recreational permits" are also available by written application with the Recreation and Parks Bureau for individuals seeking to reserve park facilities for an event involving less than twenty-five people. (York Ordinance § (d)1(3); § 741.03(d)(3).) Individuals who hold an event in violation of this statute are subject to a $1,000.00 fine or 30 days imprisonment. (York Ordinance § (g); § 741.03(j).)

In order to be considered for a permit, an applicant must first pay an application fee. (York Ordinance § (d)3; § 741.03(d)(5).) The "Basic Permit" fee is $50.00 for city residents and $100.00 for non-residents. (York City Council Resolution No. 56 of Session 2002, Doc. No. 14, Ex. A at 14.) The applicant must also pay a security deposit equal to the "estimated cost of policing, cleaning up, and restoring the park", procure and maintain insurance "in such amounts and with such coverage as shall reasonably be required by the City", agree to reimburse the City for "any such costs incurred by the City" in connection with the event, and agree to "indemnify the City and hold the City harmless

from any liability to any person resulting from any damage or injury occurring in connection with the permitted event proximately caused by the action of the [applicant]". (York Ordinance § (d)4-7; § 741.03(d)(6)-(9).) Prior to August 19, 2003, the York Ordinance also restricted the distribution of literature and the display of signs.

Permit applications are processed in order of receipt. (York Ordinance § (e)1; § 741.03(e)(1).) Pursuant to section (e)5 of the Ordinance, the City may deny applications that are not fully complete, contain material falsehood, plan activities that would represent an unreasonable danger to the health, safety, or welfare of the public, or if the applicant has not complied with the section (d) requirements. (York Ordinance § (e)5; § 741.03(e)(5).) An application that is deficient in one of the section (d) conditions, but that otherwise complies with all other requirements, will be granted a conditional approval so long as the applicant satisfies all of the section (d) requirements prior to the event. (York Ordinance § (e)2; § 741.03(e)(2).) "If no written denial or conditional approval is issued within fourteen days of the date on which a permit application is fully completed, executed and filed with the appropriate officer or employee ... the application shall be deemed to have been granted a conditional approval...." (York Ordinance § (e)3; § 741.03(e)(3).) Otherwise, an applicant will receive a written notice of denial clearly specifying the grounds upon which the permit was denied. (York Ordinance § (e)4-5; § 741.03(e)(4)-(5).)

Applicants may apply to the Solicitor's Office for a waiver of the user fee, security deposit, or certificate of insurance if "the

and 64.)

**2.** The arrangement of York Ordinance No. 10 does not exactly correspond with the arrange-

ment of Article 741 of the Codified Ordinance of the City of York, § 741.03. For clarity, the Court will cite to both ordinances.

activity is protected by the First Amendment of the Untied States Constitution and the requirement would be so financially burdensome that it would preclude the applicant from using Park property for the proposed activity." (York Ordinance § (f)3; § 741.03(f)(3).) If no written denial of waiver is issued within fourteen days, the waiver is deemed approved.[3] (*Id.*) Any application denied by the City or waiver denied by the Solicitor's Office may be appealed to the Recreation Director who, within seven days, must affirm, modify, or reverse the denial. (York Ordinance § (f)1; § 741.03(f)(1).)

On or about June 14, 2002, the Nationalist Movement ("Plaintiff") submitted an application for a permit to hold a protest of the Martin Luther King, Jr. holiday, in and around York City Hall, on January 20, 2003. On its application, Plaintiff objected to several of the provisions of the York Ordinance, including, *inter alia* restrictions on distribution of literature, restrictions on the display of signs, the required security deposit, the indemnification agreement, the permit fee, and the payment of police and public work services costs. (Doc. No. 14, Ex E.) In protest of the permit fee, Plaintiff did not submit any form of payment for fees or costs required by the application.

By letter dated July 12, 2002, Defendant's Assistant City Solicitor notified Plaintiff that the permit application was being denied as incomplete and for failure to comply with the York Ordinance. On or about July 15, 2002, Plaintiff appealed the denial. On July 25, 2002, Defendant's Director of Public Works affirmed the denial. Thereafter, Plaintiff requested that Defendant's City Council entertain a further appeal. Plaintiff's request was denied.

On August 2, 2002 (Doc. No. 14, Ex. L) and September 3, 2002 (Doc. No. 14 Ex. P), Plaintiff wrote to Defendant requesting a waiver form excusing Plaintiff from paying the application fee. Plaintiff received no response from Defendant to either request for a fee waiver. On October 25, 2002, Plaintiff initiated the instant civil action by filing a Complaint grounded in the First, Fifth and Fourteenth Amendments and for declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202. (Doc. No. 1.) On January 03, 2003, Plaintiff filed a motion to dismiss the Complaint. (Doc. No. 11.) The same day, Plaintiff filed a motion for a temporary restraining order and a preliminary and permanent injunction. (Doc. No. 12.) By Order dated January 10, 2003, the Court scheduled an injunction hearing for January 13, 2003. (Doc. No. 20.) However, prior to the scheduled hearing, Defendant agreed that Plaintiff could hold its event on January 20, 2003 without obtaining a permit and agreed to provide police protection and electricity, for the nominal fee of $1. (Doc. No. 21.) Defendant did not concede any defect in the Ordinance, but represented to the Court that the Ordinance was inapplicable because Plaintiff's gathering was too small. Pursuant to the agreement, Defendant withdrew its motion to dismiss and Plaintiff withdrew its motion for a temporary restraining order. The parties thereafter reported to the Court that Plaintiff's event was held without incident and that fewer than twenty-five people attended Plaintiff's rally.

On August 19, 2003, Defendant amended the York Ordinance, deleting the provisions restricting the circulation of papers and the display of signs. On May 5, 2003, with the permission of the Court, Defen-

---

**3.** However, even if a waiver of the user fee is issued, the applicant may have to retroactively pay the user fee if the applicant raises sufficient funds during the event. (York Ordinance § (f)3.)

dant filed a motion to "Enforce Settlement Agreement or, in the alternative, Motion to Dismiss". (Doc. No. 29.) By Order dated March 23, 2004, the Court denied Defendant's motion.

## II. *Standard of Review*

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56; *White v. Westinghouse Elec. Co.,* 862 F.2d 56, 59 (3d Cir.1988). A factual dispute is material if it might affect the outcome of the suit under the applicable law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the nonmoving party. *Id.* at 249, 106 S.Ct. 2505. The evidence presented must be viewed in the light most favorable to the non-moving party. *Id.* "The inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one sided that one party must, as a matter of law, prevail over the other." *Id.* This standard does not change by virtue of cross-motions being presented. *United States v. Hall,* 730 F.Supp. 646, 648 (M.D.Pa.1990).

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. *Childers v. Joseph,* 842 F.2d 689, 694 (3d Cir.1988). Once the moving party has shown that there is an absence of evidence to support the non-moving party's claims, the non-moving party may not simply sit back and rest on the allegations in the complaint. Instead, the non-moving party must "go beyond the pleadings and by [its] own affidavits, or by

the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The evidence must be viewed in the light most favorable to the non-movant. *See Groman v. Township of Manalapan,* 47 F.3d 628, 633 (3d Cir. 1995). Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

With respect to the sufficiency of the evidence that the nonmoving party must provide, a court should grant summary judgment where the nonmovant's evidence is merely colorable, conclusory or speculative. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). There must be more than a scintilla of evidence supporting the nonmoving part and more than some metaphysical doubt as to the material facts. *Id.* at 252, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## III. *Discussion*

Plaintiff alleges that the York Ordinance violates the First Amendment of the United States Constitution, facially and as applied. Plaintiff also claims that Defendant violated its right to due process and equal protection under the law in not ruling on its request for a waiver of fees. Both parties seek summary judgment in their favor on all counts of the Complaint. The Court will address each claim in turn.

### A. Plaintiff's First Amendment Challenge

The First Amendment of the United States Constitution protects speech and

**580**

other expressive activity in public places, or "government fora," although the degree of protection depends upon the type of forum at issue. *Kreimer v. Bureau of Police,* 958 F.2d 1242, 1255–56 (3d Cir. 1992). The Supreme Court has identified three types of fora: traditional public fora; designated public fora; and nonpublic fora. *Arkansas Educ. Television Comm'n v. Forbes,* 523 U.S. 666, 677, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998). Traditional public fora consist of streets, parks and public sidewalks long considered as places for public assembly and the communication of ideas. *Kreimer,* 958 F.2d at 1261. Designated public fora are areas the government has specified for First Amendment activities. Included in this group are "limited public fora," property designated by the government for the exercise of some forms of First Amendment activity, but not all. *Id.* Nonpublic fora are places "which are not by tradition or designation [fora] for public communication...." *Id.* at 1255–56 (brackets in original) (quoted case omitted). This third group is the government equivalent of private property. *Id.* at 1256.

■ For traditional fora and designated fora, government regulation of First Amendment activities is subject to higher judicial scrutiny than regulation in non-public fora. *Id.* In these areas, prior restraint of First Amendment activity is constitutional only if the regulation does not "delegate overly broad licensing discretion to a government official," *Forsyth County v. Nationalist Movement,* 505 U.S. 123, 130, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992), is "justified without reference to the content of the regulated speech, ... [is] narrowly tailored to serve a significant governmental interest, and ... leave[s] open ample alternative channels for communication of the information" *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (quoted cases omitted). The same stan-

dard applies to regulation in limited public fora for First Amendment activities either permitted in that area or consistent with permitted activities. *Kreimer,* 958 F.2d at 1262. Otherwise, regulation of First Amendment activities in limited public fora and nonpublic fora need only be reasonable and not an effort to suppress communication based on the speaker's view. *Id.* at 1256, 1262.

■ Plaintiff attempts to distinguish the public streets surrounding a city hall from all other governmental fora, arguing that the former "comprise[s] the 'quintessential,' 'classic' public forum" and should therefore be "accorded the utmost protection." (Doc. No. 65 at 8.) Regulation of First Amendment activity on public streets is subject to the highest form of review under *Forbes.* The Court finds no legal basis for the proposition that a fourth, higher form of governmental fora need be created to protect the area directly surrounding a city or municipal hall. Accordingly, the Court will conduct its review of the York ordinance pursuant to the traditional fora analysis.

### 1. *Facial Challenge*

Plaintiff argues that the York Ordinance runs afoul of the First Amendment on its face because it requires an application fee, a security deposit, and insurance coverage prior to approval, and grants the city officials undue discretion in determining the amount of each of the above. Plaintiff also objects to the indemnification requirement, arguing that the hold-harmless provision makes speech, and especially controversial speech, available only to those individuals wealthy enough to assume the risk of liability.

The Supreme Court has long held that a state may require, as a prerequisite to engaging in expressive activity on public land, that a permit applicant pay fees to

defray government costs directly attributable to the speech activity. *Cox v. New Hampshire,* 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941). The Court has reasoned that such costs are allowable because the government has a substantial interest in "coordinating multiple uses of limited space" that implicates an applicant's interest in the use and enjoyment of that space. *Thomas v. Chicago Park District,* 534 U.S. 316, 323, 122 S.Ct. 775, 151 L.Ed.2d 783 (2002). The *Cox* Court upheld a fee that ranged from "$300 to a nominal amount" and that was intended "to meet the expense incident to the administration of the [licensing] act and to the maintenance of public order in the matter licensed." 312 U.S. at 576–77, 61 S.Ct. 762. However, courts have since struck down permit schemes that grant city officials too broad a degree of discretion during the application approval process or in setting fee amounts. *See Forsyth County,* 505 U.S. at 131–33, 112 S.Ct. 2395 (invalidating permit fee requirement because of the unbridled discretion granted to the county administrator).

In *Forsyth County v. Nationalist Movement,* the Supreme Court noted that an ordinance requiring a permit and a fee as a precondition to authorizing speaking, parades, or assemblies in a public forum is formally a prior restraint on speech and that there is a "heavy presumption" against the validity of a prior restraint. 505 U.S. at 130, 112 S.Ct. 2395. Notwithstanding this presumption, the *Forsyth* Court recognized that permit and fee requirements may be imposed by the government in order to regulate competing uses of public forums, so long as the government officials do not have overly broad discretion in determining when to apply the fee and in what amount. *Id.*

Recently, in *Thomas v. Chicago Park,* the Supreme Court upheld an ordinance that required a person to obtain a permit in order to "conduct a public assembly, parade, picnic, or other event involving more than fifty individuals," or engage in an activity such as "creating or emitting any Amplified Sound" on public land. 534 U.S. at 318, 122 S.Ct. 775. The permit statute in *Thomas* was substantially similar to that challenged in this case, as were the specified grounds for rejection of a permit under the Chicago ordinance. *Compare Thomas,* 534 U.S. at 318–19, 319 n. 1, 122 S.Ct. 775 *with* York Ordinance § (e)5 (§ 741.03(e)(5)). The Supreme Court noted that:

> the object of the permit system (as plainly indicated by the permissible grounds for permit denial) is not to exclude communication of a particular content, but to coordinate multiple uses of limited space, to assure preservation of the park facilities, to prevent uses that are dangerous, unlawful, or impermissible under the Park District's rules, and to assure financial accountability for damage caused by the event.

*Id.* at 322, 122 S.Ct. 775. However, in assessing the appropriateness of the permitting scheme as a time, place, and manner regulation, the Supreme Court opined that "even content-neutral time, place, and manner restrictions can be applied in such a manner as to stifle free expression" where the licensing official enjoys unduly broad discretion in determining whether to grant or deny a permit. *Id.* at 323, 122 S.Ct. 775 (citing *Forsyth,* 505 U.S. at 131, 112 S.Ct. 2395).

It is well established that a permit scheme regulating the time, place, and manner of speech will be upheld so long as the ordinance: (1) does not "delegate overly broad licensing discretion to a government official," (2) is content-neutral, (3) is narrowly tailored to serve a significant governmental interest, and (4) leaves open

ample alternatives for communication. *Forsyth*, 505 U.S. at 130, 112 S.Ct. 2395; *Ward v. Rock Against Racism*, 491 U.S. 781, 790–791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). *Thomas* instructs that, with regard to this first prong, a permit scheme must also contain adequate standards to guide the licensing official's decision and provide for effective judicial review. *Id.*

■ A regulation is "narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Frisby v. Schultz*, 487 U.S. 474, 485, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1998) (quoting *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 808, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984)). The ordinance need not be the least restrictive means available, merely "not substantially broader than necessary to achieve the government's interest." *Id.* The "essence of narrow tailoring" is that the ordinance must "focus[ ] on the source of the evils the city seeks to eliminate ... and eliminate[ ] them without at the same time banning or significantly restricting a substantial quantity of speech that does not create the same evils." *Id.* at 800 n. 7, 109 S.Ct. 2746.

## A. Permit Fee

■ In the instant matter, the York officials have no discretion with regard to the permit fee, as the nominal fee for a basic permit is fixed at $50 for city residents and $100 for non-residents. (York Ordinance, Resolution No. 56, Fee Schedule.) Different fees apply for use of certain city facilities within park grounds, but these fees are fixed based upon the facility reserved and the number of people attending, not based upon the purpose of the event or content of the message. *Id.* Unlike the permit fee system that the Supreme Court found unconstitutional in *Forsyth*, the instant user fee is not variable so as to allow for discretionary abuse

by city officials. *Forsyth*, 505 U.S. at 134–36, 112 S.Ct. 2395. Moreover, under section (f) subsection 3 of the York Ordinance, the city *must* waive the permit fee upon a showing that the fee would "be so financially burdensome that it would preclude the applicant from using Park property for the proposed activity." (York Ordinance § (f)3; § 741.03(f)(3).) If the applicant provides objective evidence of an inability to pay, the ordinance provides city officials no discretion in deciding when to apply the waiver. Because the nominal user fee leaves no discretion to the official, does not base the amount charged on the content of the message, is narrowly tailored to allow the city only to recover the incidental cost of processing the application, and makes provisions for groups unable to pay, the user fee does not facially violate the First Amendment. *Forsyth*, 505 U.S. at 130, 112 S.Ct. 2395. Accordingly, Defendant's motion for Summary Judgment on this claim will be granted.

## B. Insurance and Security Deposit Requirements

■ The York Ordinance requires applicants, as a prerequisite to obtaining a permit, to pay a security deposit in an amount "in accordance with the schedule of fees set by the Recreation Director and approved by City Council. The amount of the security deposit set in the schedule of fees shall be equal to the estimated cost of policing, cleaning up, and restoring the park upon the conclusion of the use or activity." (York Ordinance § (d)5; § 741.03(d)(7).) Similarly, applicants must procure insurance "in such amounts and with such coverages as shall reasonably be required by the City.... The amounts and type of insurance required shall be determined by the Public Works Department, based upon the nature of the activity and the risk involved" and will be listed in a "uniform schedule of insurance guide-

lines for particular types of activities." (York Ordinance § (d)7; § 741.03(d)(9).) On April 16, 2002, the City Council of York adopted a schedule of fees as required by the York Ordinance. (York City Council Resolution No. 56 of Session 2002, Doc. No. 14, Ex. A at 14.) This schedule of fees establishes the application permit fee, classifies the City park property, and provides that "[a]pplicants shall also be responsible for all charges incurred for Police, Fire, and Public Works services for all permits issued. A security deposit equal to the estimate cost of Policing [sic], clean up, and restoring the park is required in advance of the event...." (*Id.*) The record contains no further guidelines specifying how this estimate is calculated or any guidelines as to the amount and type of insurance required.

■ A permit licensing official may not have "unduly broad discretion" in determining whether to grant or deny a permit. *Thomas*, 534 U.S. at 321, 122 S.Ct. 775 (citing *Forsyth*, 505 U.S. at 131, 112 S.Ct. 2395). Rather, the regulation must contain "adequate standards" to guide the official's decisions. *Id.* In its papers, Defendant relies heavily upon the holding of *Thomas v. Chicago Park*, as the York Ordinance closely mirrors the Chicago ordinance upheld by the Supreme Court. (*Compare* Doc. No. 14 Ex. A *with* Doc. No. 60 Ex. 1.) In fact, the structure and language of the two ordinances are nearly identical. Both ordinances require an application fee, facility fee, security deposit, indemnification agreement, and insurance prior to approval of the permit. Both ordinances also provide procedures for review and the waiver of the user fee, security deposit, and/or certificate of insurance. However, unlike the York Ordinance, the Chicago Ordinance contains a schedule of

fees establishing guidelines for the amount of insurance required, setting the insurance amount on the size of the event and the nature of the facilities involved. *Thomas v. Chicago Park District*, 227 F.3d 921, 925 (7th Cir.2000) ("*Thomas II*").

Moreover, the appellants in *Thomas* did not challenge the provisions of the Chicago ordinance that required fees, insurance, indemnity, and a security deposit prior to approval of the permit, nor did the *Thomas* court directly address these provisions of the Chicago ordinance. *See* Petition for Writ of Certiorari, *Thomas v. Chicago Park Dist.*, 2001 WL 34091941 (February 1, 2001).[4] Contrary to Defendant's reliance, the *Thomas* court did not ratify each and every provision of the Chicago Ordinance, thus rendering any ordinance that mirrors it immune from constitutional attack.

This notwithstanding, the Supreme Court does cite approvingly the government's legitimate interest in "assur[ing] financial accountability for damage caused by the event." *Thomas*, 534 U.S. at 322, 122 S.Ct. 775. Moreover, in the underlying decision affirmed by the Supreme Court in *Thomas*, the Seventh Circuit Court of Appeals upheld the Chicago ordinance's insurance requirement because:

the amount of insurance required is not based on, or ... influenced by, the nature of the event, and specifically by whether it involves controversial expressive activity likely to incite violence by onlookers or opponents. The required amount and the cost of the insurance depend only on the size of the event and the nature of the facilities involved in it (a bandstand, stage, tents, and so forth).

*Thomas II*, 227 F.3d at 925. Similarly, the Ninth Circuit Court of Appeals found no

4. The *Thomas* Court focused on the local official's discretion to grant or deny applications under the Chicago ordinance.

First Amendment violation where a park required applicants to post a bond for liability insurance to cover equipment damage or liability resulting from the planned event's "unanticipated effects" on event attendants, because:

> [t]he bond requirement is content-neutral in that it is applied to every applicant regardless of the nature of the expression or content of the message they wish to convey. It furthers a significant governmental interest: the protection and maintenance of an expensive sound system. It is narrowly tailored to meet that goal by requiring most applicants to post the bond. Finally, the bond requirement does not completely close off an applicant's opportunities for expressive activity; an applicant who cannot afford to or does not want to post the bond may conduct many other types of expressive activity in the park.

*Gerritsen v. City of Los Angeles*, 994 F.2d 570, 578–79 (9th Cir.1993), cert. denied, 510 U.S. 915, 114 S.Ct. 306, 126 L.Ed.2d 253 (1993).

In an unpublished opinion applying the *Thomas* analysis to a Harrisburg city ordinance governing the use of the city's parks, the Third Circuit Court of Appeals found:

> the City has a substantial interest in ensuring that the public's health, welfare, safety or enjoyment of the park will not be compromised by a proposed use of the park. Accordingly, any proposed event that might result in violence, criminal activity or disorderly conduct should be denied a permit, as should any event which poses extraordinary, burdensome financial obligations on the City of Harrisburg.

*Diener v. Reed*, 77 Fed.Appx. 601, 607 (3d Cir.2003). The Third Circuit upheld the Harrisburg ordinance's permit scheme as content-neutral time, place, and manner restrictions narrowly-tailored to serve a significant governmental interest. The Court also rejected the as-applied challenge to the provisions because it found the "exclusion of Appellants ... [was] content-neutral, based on their behavior, not the content of their speech." *Id.* at 609.[5] As distinguished from the ordinance upheld in *Diener,* the York Ordinance does not establish a security deposit schedule and provides no guidance in calculating the prerequisite insurance coverage, nor what factors Defendant should consider when determining the amounts required.

Unlike the ordinance challenged in *Thomas,* the York Ordinance is not replete with guidelines calculating the insurance requirement based upon the size of the event and the nature of the facilities involved. 227 F.3d at 925. Instead, York officials are vested with the unbridled discretion to set the insurance requirement and security deposit based upon the content of the message or their own opinions about the speaker. The statute contains no guidelines as to the amount and type of insurance converge required, leaving such a determination wholly up to the city official's discretion. The Ordinance requires the Public Works Department to prepare "a uniform schedule of insurance guidelines for particular types of activities", yet the record contains no such schedule. Unlike the Chicago Ordinance wherein a schedule established insurance requirements "only on the size of the event and the nature of the facilities involved in it[,]" York officials are free to base the insurance requirement on the group's reputation. *Thomas II,* 227 F.3d at 925.

---

5. Here again, the Appellate Court upheld the official's discretionary power as it applied to granting or denying the permit, but did not directly address the constitutionality of the fiscal prerequisites at issue here.

Without specific guidelines calculating the insurance and deposit requirements using content-neutral factors, thereby limiting the scope of the city officials' discretion, these provisions contain "the possibility of censorship through uncontrolled discretion." *Id.* at 133, 112 S.Ct. 2395. In fact, Defendant admits that city officials base these figures upon the reputation of the speaker. (Oral Argument Transcript at 46–7.)[6] The Supreme Court has routinely held that "[r]egulations which permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment." *Forsyth,* 505 U.S. at 135, 112 S.Ct. 2395 (citing *Regan v. Time, Inc.,* 468 U.S. 641, 648–649, 104 S.Ct. 3262, 82 L.Ed.2d 487 (1984); *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.,* 502 U.S. 105, 116, 112 S.Ct. 501, 116 L.Ed.2d 476, (1991); *Arkansas Writers' Project, Inc. v. Ragland,* 481 U.S. 221, 230, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987)). Without content-neutral guidelines limiting city officials' discretion in this regard, the York Ordinance allows the city to unconstitutionally "charg[e] a premium in the case of a controversial political message delivered before a hostile audience." *Forsyth,* 505 U.S. at 136, 112 S.Ct. 2395. Accordingly, Article 741 of the Codified Ordinances of the City of York, Pennsylvania, Section 741.03, subsection (d)5 and subsection (d)7—the insurance and security deposit provisions—are facially unconstitutional and cannot be enforced. Therefore, Plaintiff's motion for summary judgment with regard to these claims will be granted.

## C. Indemnification and Reimbursement Agreement

■ In addition to requiring proof of insurance and a security deposit, the York Ordinance further requires applicants to sign an indemnification and reimbursement agreement, wherein:

the applicant shall promise and covenant to bear all costs of policing, cleaning up, and restoring the park upon conclusion of the event or activity; to reimburse the City for any such costs incurred by the City; and to indemnify the City and hold the City harmless from any liability to any person resulting from any damage or injury occurring in connection with the permitted event proximately caused by the action of the permittee, the sponsoring organization, its officers, employees or agents or any person under their control insofar as permitted by law.

6. The practical effect was explained by Defendant during oral argument. Counsel for Defendant represented to the Court that "the amount of the security deposit is set and should equal to the estimate cost of policing, cleaning up, and restoring the park upon the conclusion of the use or activity." (Oral Argument Transcript at 46 ¶¶ 16–19.) Defendant conceded that it examines the nature of the event, rather than the mere size of the event or the facilities intended to be used, in determining the cost of the deposit on the theory that certain events require more police presence. The Ordinance offers no objective standard by which such an assessment might be made. Anticipatory cleanup costs and police estimates under the York Ordinance appear to be based merely upon the city's estimation of an applicant's reputation and the unpopularity of the group's message. (Oral Argument Transcript at 46.) If York officials assume that unpopular organizations will inherently require a higher police presence and greater cleanup costs, as counsel suggests, then speakers with unpopular messages will be required to deposit much more money prior to speaking than groups with better "reputations". (Oral Argument Transcript at 46–7.) This content based scheme not only grants broad discretion to city officials, but also threatens to dissuade unpopular groups from utilizing traditional public forums by placing a premium on—what the city views as—unpopular speech.

(York Ordinance § (d)4; § 741.03(d)(6).) Within the application itself, the applicant must sign and agree, *inter alia:*

> to reimburse the City of York for any additional costs of clean-up and restoration of the park upon conclusion of the event described above [and] to indemnify and hold the City of York harmless from any liability to any person resulting from any property damage or personal injury occurring in connection with the event caused by the applicant or the sponsoring organization, its officers, employees, or any person under its control.

(Doc. No. 14, Ex. E.) This provision mirrors that of the Chicago Ordinance. (*See* Doc. No. 60, Ex. 1.)

■ A municipality has a legitimate interest in "assur[ing] financial accountability for damage caused by [an] event" on public land, and may enact content-neutral time, place, and manner regulations narrowly tailored to serve this interest. *Thomas*, 534 U.S. at 322–23, 122 S.Ct. 775. " 'To allow unregulated access to all comers could easily reduce rather than enlarge the park's utility as a forum for speech.' " *Id.* at 322, 122 S.Ct. 775 (quoting *Thomas II*, 227 F.3d at 924.) Accordingly, the City of York has a legitimate interest in limiting liability caused by the actions of event organizers and seeking reimbursement for damage to park grounds and facilities.

■ Unlike other indemnity provisions which have been struck down by lower courts, the York Ordinance's hold-harmless provision does not include injury resulting from the actions of counter-demonstrators, thereby allowing a heckler's veto.[7] *See Van Arnam v. General Services Administration*, 332 F.Supp.2d 376, 395–407 (D.Mass.2004) (finding unconstitutional a hold-harmless provision indemnifying the

government from "any and all loss, damage, claim or liability whatsoever ... directly or indirectly due to the exercise by the licensee" of the permit). Instead, the indemnification agreement indemnifies only those injuries proximately caused by the actions of the applicant. Thus, applicants with unpopular messages have no more risk under this provision than a speaker with popular views.

There is nothing in the record to support a finding that York officials are enforcing the reimbursement agreement differently based upon the content of the speech. Unlike estimated costs calculated before the event, which without adequate standards could be applied so as to stifle unpopular speech, the above provision requires reimbursement of only those actual costs incurred by the municipality in connection with the event. (York Ordinance § (d)4; § 741.03(d)(6).)

The reimbursement and hold-harmless provision does not, on its face, restrict, inhibit, or discourage free speech in public forums. The provision does not grant the city officials broad discretion, is content-neutral, and is narrowly tailored to achieve the significant government interests of protecting public property while reasonably shielding the city from liability. Accordingly, Defendant's motion for summary judgment with regard to this claim will be granted.

### D. Severability

■ When a federal court is called upon to invalidate a local ordinance, the severability of the constitutional portions of the ordinance are governed by state law, here the law of Pennsylvania. *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 772, 108 S.Ct. 2138, 100 L.Ed.2d

---

7. Under Pennsylvania law, hold-harmless provisions are strictly construed against the party seeking their protection and limited in scope to matters expressly covered therein. *Fulmer v. Duquesne Light Co.*, 374 Pa.Super. 537, 543 A.2d 1100, 1103 (1988).

771 (1988); *Contractors Assn. of Eastern Pa., Inc. v. Philadelphia,* 6 F.3d 990, 997 (3d Cir.1993). Generally, the severability of a statute is a question of legislative intent as to the specific provision. *Rappa v. New Castle County,* 18 F.3d 1043, 1072 (3d Cir.1994). Pennsylvania law favors severability. *Contractors Assn. of Eastern Pa. v. City of Philadelphia,* 6 F.3d 990, 997 (3d Cir.1993). Pennsylvania has a general severability statute that reads:

> The provisions of every statute shall be severable. If any provision of any statute or the application thereof to any person or circumstance is held invalid, the remainder of the statute, and the application of such provision to other persons or circumstances, shall not be affected thereby, unless the court finds that the valid provisions of the statute are so essentially and inseparably connected with, and so depend upon, the void provision or application, that it cannot be presumed the General Assembly would have enacted the remaining valid provisions without the void one; or unless the court finds that the remaining valid provisions, standing alone, are incomplete and are incapable of being executed in accordance with the legislative intent.

1 Pa. Const. Stat. Ann. § 1925 (Supp. 2005). Additionally, there is a presumption in favor of severability where, as here, the ordinance contains a specific severability provision. *Contractors Assn. of Eastern Pa.,* 6 F.3d at 997. The York Ordinance's severability provision provides in pertinent part that "[i]f any provision of this ordinance or the application thereof to any person or circumstance be held invalid, the remainder of this ordinance and the application of such provision to other persons or circumstances shall not be affected thereby." (York Ordinance § (h).)

 Equipped with these principles, the Court must decide whether the York Ordinance's provisions "are distinct and not so interwoven as to be inseparable." *Saulsbury v. Bethlehem Steel Co.,* 413 Pa. 316, 196 A.2d 664, 666 (1964). The Court does not find that the unconstitutional provisions are inseparable from the ordinance as a whole. These provisions are merely independent prerequisites to final approval of a permit. The unenforceability of these sections do not affect the city's power to enforce the remainder of the permit scheme. Subsections (d)5 and (d)7 of the York Ordinance (subsections (d)(7) and (d)(9) of § 741.03) are severable from the remainder of the ordinance. Accordingly, the statute remains enforceable except for the provisions found unconstitutional herein.

### 2. *As-applied Challenge*

Plaintiff argues that Defendant's application of the statute with regard to Plaintiff violated its First Amendment rights. Plaintiff alleges that Defendant is hostile towards its organization and denied its permit due to the content of the planned event and the nature of the organization. In support thereof, Plaintiff offers two affidavits by individual supporters testifying on the adverse political climate in the City of York. (Doc. Nos.62–63.) Plaintiff states, without citation or reference to the record, that "City officials had made their opposition to 'racism' clear through pronouncements and involvement in the York Unity events, including a rally at City Hall." (Doc. No. 64 at 3.) Moreover, Plaintiff contends, without citation or reference to the record, that "Mr. Musso, author of the measure, has stated that the law was promulgated specifically run out of town [sic] those whose speech and beliefs he disagreed with." (Doc No. 39 at 14.) Plaintiff offers two letters, dated August 2, 2002 (Doc. No. 14, Ex. L) and September 3, 2002 (Doc. No. 14 Ex. P), allegedly sent to Defendant wherein Plaintiff requests waiv-

er forms. Plaintiff argues that Defendant's refusal to respond to these letters or provide the requested waiver forms demonstrates an animus towards the organization. (Doc. No. 39.)

Plaintiff neglects to report that it refused to pay the basic permit fee and it was for this reason that its permit was denied. (Plaintiff's Application, Doc. No. 14, Ex. E.) The notations written on the permit application and correspondences sent to Defendant by Plaintiff's counsel clearly indicate a refusal to pay the administrative fee required of all applicants. (Doc. No. 14, Exs. E, F, and G.) Failure to pay the permit fee is one of the enumerated grounds for denial of the application. (York Ordinance § (e)5(2); § 741.03(e)(5)(B).) The record is clear that Defendant's requests for a waiver form were sent only after the application had been denied and its appeal denied. The Court finds no evidence of record that other organizations similarly situated were treated more favorably than Plaintiff.[8] Defendant's denial of Plaintiff's application was based upon constitutionally enforceable provisions of the York Ordinance and was content-neutral, based on lawful procedure, not the content of Plaintiff's speech. Similarly, Plaintiff puts forth no evidence that Defendant has ever used the indemnity provision to protect itself, let alone applied the provision differently to different groups based upon the content of their message. Accordingly, Defendant's motion for summary judgment regarding the as-applied claims will be granted.

## B. Equal Protection

■ While the Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike," *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985), the Supreme Court has clarified that "equal protection does not require that all persons be dealt with identically, but it does require that a distinction made have some relevance to the purposes for which the classification is made." *Baxstrom v. Herold*, 383 U.S. 107, 111, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966); *Walters v. City of St. Louis*, 347 U.S. 231, 237, 74 S.Ct. 505, 98 L.Ed. 660 (1954). Further, the "Equal Protection Clause requires that statutes affecting First Amendment interests be narrowly tailored to their legitimate objectives." *Police Dep't of the City of Chicago v. Mosley*, 408 U.S. 92, 101, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972).

■ Plaintiff argues that the York Ordinance's fee scheme violates the Fourteenth Amendment to the United States Constitution, in that the ordinance "sets up a classification for the enjoyment of constitutional rights—those who can afford to pay versus those who cannot .... [and] differentiate[s] between 'residents' and 'non-residents' in its license fees." (Doc. No. 39 at 12.) Plaintiff's Equal Protection claims are functionally identical to its First Amendment claims against the same provisions of the York Ordinance. As the Third Circuit recently opined in *Hill v. City of Scranton*,

8. A court should "generally not invalidate a waiver provision for overly broad discretion unless and until there is a showing of a pattern of unlawful favoritism. To do otherwise would have the unintended effect of restricting more speech because [the municipality] could not relax its permitting rules to increase access to the forum. A rigid application of the permitting scheme would prevent any group with an emergent need, or any speaker with the inability to pay the permit fee, to use [public land] for speech activities. It is undoubtedly preferable to allow some flexibility in the name of *increasing the exercise of* protected speech." *Parks v. Finan*, 385 F.3d 694, 700 (6th Cir.2004) (internal quotation marks omitted).

"it is generally unnecessary to analyze laws which burden the exercise of First Amendment rights by a class of persons under the equal protection guarantee, because the substantive guarantees of the [First] Amendment serve as the strongest protection against the limitation of these rights." If a law passes muster under the First Amendment it is also likely to be upheld under the Equal Protection clause. Likewise, if a law violates First Amendment rights there is no need to resort to the Equal Protection clause to redress the constitutional violation.

411 F.3d 118, 126 (3d Cir.2005) (quoting Ronald Rotunda & John Nowak, 3 Treatise on Constitutional Law: Substance and Procedure § 18.40, at 796 (3d ed.1999)) (internal citations omitted); *see also San Filippo v. Bongiovanni*, 30 F.3d 424, 430 n. 6 (3d Cir.1994) (where the Third Circuit followed the same approach but did not provide an explanatory discussion because in that case "the parties agree[d] that the analysis is the same under the first amendment and equal protection claims").

 For the reasons discussed above, this Court finds that the York Ordinance's user fee scheme does not violate the First Amendment on its face. The nominal permit fee reimburses the city for the incidental cost of processing the application. Moreover, the de minimis reduction in that fee for city residents furthers the legitimate government purpose of encouraging city residents to hold events locally within the city. Further, city residents already fund the York recreational department through the taxes they pay. Accordingly, upon careful review of the ordinance fee structure, the Court finds no violation of the constitutional guarantee of equal protection under the law.

To the extent that Plaintiff also alleges that Defendant violated its rights to due process and equal protection in applying the fee scheme—that is to say, Defendant allegedly waives fees for favored speakers but denies such waivers for disfavored speakers, such as Plaintiff—this claim is identical to Plaintiff's First Amendment as-applied claim. (Doc. No. 39 at 12.) A finding that Defendant ignored Plaintiff's waiver requests in order to prevent the group from conducting a rally would demonstrate a First Amendment violation and invalidate the provision. If the finder of fact found that Defendant did not violate the ordinance's waiver procedure with respect to Plaintiff's request so as to trigger a First Amendment violation, then Plaintiff would have received all the process due under the Fourteenth Amendment.[9] *Hill*, 411 F.3d at 126. As discussed more fully in the First Amendment section above, Plaintiff puts forth no evidence demonstrating that other organizations who also refused to tender the permit fee were treated more favorably than Plaintiff. Accordingly, Defendant's motion for summary judgment in this regard will be granted and Plaintiff's Equal Protection and Due Process claims will be dismissed.

## C. Void for Vagueness

 Plaintiff argues that the York Ordinance violates the Fourteenth Amendment because it lacks "sufficient definiteness" so as to allow "those seeking to speak in the public forum to know whether they risk criminal sanctions." (Doc. No. 39 at 12–13.) Plaintiff's terse two sentence argument for summary judgment on this claim fails to indicate which provisions of the York Ordinance suffer from vagueness. In Count III of the Complaint, Plaintiff

9. Moreover, pursuant to the Local Agency Law, 2 Pa. Cons.Stat. Ann. § 752, *et seq.*, Plaintiff was entitled to a second review of his denial by the state courts, an avenue Plaintiff chose not to pursue.

alleges that the ordinance provisions requiring insurance, imposing fees, and establishing the procedures for application approval are unconstitutionally vague. (Doc. No. 1 at 30–1.)

The permit and facility fee scheme contains fixed amounts for the different available permits in a format easily understood by the average applicant. (York Ordinance, Resolution No. 56, Fee Schedule.) Similarly, the ordinance clearly lists the grounds upon which the city may deny an application and the procedure for review. (York Ordinance §§ (e)-(f); § 741.03(e)-(f).) With regard to the insurance and security deposit requirements, Plaintiff's claims again mirror those claims already brought pursuant to the First Amendment. Accordingly, Defendant's motion for summary judgment in this regard will be granted and Plaintiff's claim that the York Ordinance is void for vagueness will be dismissed.

### D. Overbreadth

 In Count IV of the Complaint, Plaintiff argues that the York Ordinance is unconstitutionally overbroad. (Doc. No. 1 at 31–32.) A regulation is unconstitutional on its face on overbreadth grounds "where there is 'a likelihood that the statute's very existence will inhibit free expression' by 'inhibiting the speech of third parties who are not before the Court.'" *Saxe v. State College Area Sch. Dist.,* 240 F.3d 200, 214 (3d Cir.2001) (quoting *Members of City Council v. Taxpayers for Vincent,* 466 U.S. 789, 799, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984)). In order to render a law unconstitutional, "the overbreadth must be 'not only real but substantial in relation to the statute's plainly legitimate sweep.'" *Saxe,* 240 F.3d at 214 (*quoting Broadrick v. Oklahoma,* 413 U.S. 601, 615, 93 S.Ct.

2908, 37 L.Ed.2d 830 (1973)). In *Lakewood v. Plain Dealer Publ'g Co.,* 486 U.S. 750, 751, 108 S.Ct. 2138, 100 L.Ed.2d 771, (1988), the Supreme Court set forth a two-part test governing when a First Amendment facial challenge may be made to an allegedly overbroad licensing scheme. First, the regulation must confer upon a governmental official or agency "substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers." *Lakewood,* 486 U.S. at 759, 108 S.Ct. 2138. Second, "the law must have a close enough nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial threat of the identified censorship risks." *Id.*

This claim mirrors Plaintiff's First Amendment Freedom of Expression claim. As discussed more fully above, municipalities may require that organizations obtain a permit prior to engaging in expressive activity on public land. *Cox,* 312 U.S. at 577, 61 S.Ct. 762. The provisions of the York Ordinance found to grant city officials too great discretion so as to permit suppression of disfavored speech, have already been found by this Court to be unconstitutional. The remainder of the York Ordinance is a content-neutral time, place, and manner restriction allowable under the First Amendment. *See* Section III(a) supra. Accordingly, Defendant's motion for summary judgment in this regard will be granted and Plaintiff's overbreadth claim will be dismissed.

### E. Freedom of Association

 In its Complaint, Plaintiff also alleges that the York Ordinance violates its right to freedom of association.[10] (Doc.

---

**10.** Although both sides seek summary judgment on all counts of the Complaint, neither side directly briefed this issue.

No. 1, Count IX.) Specifically, Plaintiff alleges that "its organizing efforts [have been] hindered, it ability to associate together for the common purpose of recruiting, discussion and advocacy on matters of public interest have been hindered and its efforts to garner support for its agenda have been hampered." (Doc. No. 1, ¶ 68.) Again, Plaintiff's claim mirrors its First Amendment Freedom of Expression claim. Defendant's alleged hindrance is entirely within the context of preventing Plaintiff from rallying on the capital steps without a permit. Plaintiff alleges no further action taken by Defendant attempts to prevent Plaintiff's members from meeting on private land or associating with each other in any other context. Accordingly, Defendant's motion for summary judgment in this regard will be granted and Plaintiff's claim will be dismissed.

### F. Conclusion

For the reasons discussed above, the Court finds that Article 741 of the Codified Ordinances of the City of York, Pennsylvania, Section 741.03, subsection (d)(7) and subsection (d)(9), violate Plaintiff's First Amendment right to freedom of expression and are therefore unenforceable as written. The Court finds that the remainder of the ordinance is constitutional on its face and as applied to Plaintiff. Plaintiff's equal protection, void-for-vagueness, overbreadth, and freedom of association claims will also be dismissed.

### IV. *Order*

**AND NOW**, this 24th day of March, 2006, **IT IS HEREBY ORDERED THAT** Plaintiff's Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part. Plaintiff's Motion for Summary Judgment is granted as to Count II of the Complaint. **IT IS HEREBY DECLARED** that Article 741 of the Codified Ordinances of the City of York, Pennsylvania, Section 741.03, subsection (d)(7) and subsection (d)(9) are unconstitutional as written. In all other respects, Plaintiff's motion is denied.

Defendant's Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part. Defendant's motion is granted with regard to: Plaintiff's First Amendment challenges to all other aspects of the Ordinance; Plaintiff's claims of denial of Equal Protection and Due Process; and Plaintiff's challenge to the Ordinance as void for vagueness and overbroad. Accordingly, Counts I, III, IV, V VI, VII, VIII and IX of the Complaint are **HEREBY DISMISSED**. In all other respects, Defendant's motion is denied. The Clerk of Court is directed to **CLOSE** the file.

### APPENDIX A

### ARTICLE 741

### Park Conduct

741.01 Council control of monuments.

741.02 Prohibited acts.

741.03 Public meetings.

741.04 Fishing in Kiwanis Lake.

741.05 Permitted advertising.

741.99 Penalty.

### CROSS REFERENCES

Bicycles prohibited in parks—
see TRAF. 533.09

Littering in bodies of water—
see GEN. OFF. 729.02

741.03 PUBLIC MEETINGS.

(a) *Designation of Park Facilities.*

(1) *Proposed designation.* The Recreation Director shall classify all City park property under a uniform system of classification and designate for each such classification the use or uses which, in his/her judgment,

should be permitted therein. Categories of classifications which the Recreation Director shall designate may included, but are not limited to, parks, playgrounds, playlots, and leased facilities. The Recreation Director shall classify all City park property under the following classification system:

A. "Public Forums" shall be defined as areas open to any legal public assembly pursuant to the limitations set forth herein.

B. "Limited Use Areas" shall be defined as those buildings, improvements, and other areas for which a specific use or occupancy is intended. Such areas shall include, but not be limited to, picnic and pavilion areas, playgrounds, basketball and tennis courts, etc.

C. "Areas or Facilities Not Designated for Public Assembly" shall be defined as those buildings, improvements and other areas not open to the general public. Such areas shall include not be limited to, maintenance, storage, employee and operational areas.

D. "Special Facilities" shall be defined as those buildings, improvements and other areas designed or designated for a specific use and occupancy. Such facilities shall include but not be limited to the Farquar Park Band Stand, stages, boat launch, miniature golf course and batting cages. Use of these facilities may involve a rental, admission, team or other related fee.

The Recreation Director shall then record the designations for each park and shall transmit the same promptly to City Council, which shall then approve, amend or reject the designations. Thereafter, the Recreation Director may, from time to time, as he/she shall deem necessary and proper, amend or revise his/her designations and shall promptly transmit in writing the amendments or revisions to City Council, which shall approve, amend or reject the same. All such designations, and the Superintendent's amendments and revisions thereof, shall be in full force and effect from the time that the same are expressly approved as such or as amended by City Council.

(2) *Public review of proposed designation.* Simultaneous with the transmission to City Council of the plats or maps required by this ordinance, or of any written amendments or revisions thereof, the Recreation Director shall file a duplicate copy of the same with the City Clerk, which duplicate copy shall be available for public inspection in the Office of the City Clerk during normal business hours.

(b) *Rules and Regulations.* The Recreation Director may, from time to time, establish reasonable rules and regulations, for the use of each facility in the Park System and for obtaining permits pursuant to this chapter. Such rules and regulations shall be based on a due regard for the purpose for which the facility is established, the safety of those using the facility, of City employees and of the public, the safety and maintenance of Park property, the need for and the availability of supervisory personnel, and the maximum number of people who can safely use the facility at one time. Subject to the foregoing, and except as hereinafter provided, all Park facilities may be used by members of the general public, without permit, for recreational and athletic purposes not inconsis-

tent with the nature of the facility and the safety of the public and of Park property.

(c) *Permit Requirement.*

(1) *General.* No person shall, without a permit:

A. Conduct a public assembly, parade, picnic, or other event involving more than twenty-five individuals;

B. (EDITOR'S NOTE: This subsection B. is intentionally left blank by Ordinance 33–2003, passed September 9, 2003);

C. Conduct an exhibit, music or dramatic performance, fair, circus, concert, play, radio or television broadcast, other than a news transmission;

D. Exhibit or display any motion picture, television program, light or later light display, or similar event;

E. Operate a vehicle, except upon a publicly dedicated street, alley, watercourse or other thoroughfare which may abut or traverse a park;

F. Create or emit any amplified sound, except from a radio, recorder or other device possessed and used by an individual for his/her own enjoyment and operated in such a manner so as not to interfere with the use and enjoyment by another person;

G. Station or erect any building, tent, canopy, stand, bandstand, stage, tower, scaffold, sound stage, platform, rostrum or other structure;

H. Station or use any electrical or electronic device or equipment that would require outdoor auxiliary power;

I. Sell or offer for sale any goods or services;

J. (EDITOR'S NOTE: This subsection J. is intentionally left blank by Ordinance 33–2003, passed September 9, 2003.);

K. Bring, land or cause to ascend or descend or alight within the Park, any airplane, helicopter, flying machine, balloon, parachute or other apparatus for aviation (a kite shall not be considered an "apparatus for aviation" for purposes of this subsection);

L. Conduct any sporting event;

M. Ride any horse on any driveway, roadway, path or trail; or

N. Bring onto property a tame, non-domestic supervised and controlled or restrained animal for limited non-commercial or promotional purposes.

(2) *Permits for activities involving more than 100 individuals.* No activity involving more than one hundred individuals shall be held within two thousand five hundred feet nor within two hours of any other activity involving more than one hundred individuals.

(d) *Application for Permits.*

(1) *Filing written application.*

A. Special Event Permit. Any person seeking the issuance of a permit shall apply for a permit by filing a written application for permit on a form and within such time as shall be prescribed by the Recreation Director. Applications involving any of the following activities shall be filed with the Recreation Director or his/her designee.

1. An event involving more than twenty-five individuals;

2. The sale or offering for sale of any good or service;

3. The sale or service of alcohol on Park property;

4. Advertising or commercial activities;

5. Activities involving more than one park;

6. A religious or political event;

7. Creation or omission of any amplified sound, except from a radio, recorder or other device possessed and used by an individual for his/her own enjoyment and operated in such a manner so as not to interfere with the use and enjoyment by another person;

8. Stationing or erecting any building, stand, bandstand, stage, tower, tent, canopy, scaffold, sound stage, platform, rostrum or other structure;

9. Use of any electrical or electronic device or equipment requiring outdoor auxiliary power;

10. Bring, land or cause to ascend or descent or alight within the Park, any airplane, helicopter, flying machine, balloon, parachute or other apparatus for aviation (a kite shall not be considered an "apparatus for aviation" for purposes of this subsection);

11. Riding of a horse or horses; or

12. Use of mechanical rides.

(2) *Media/motion picture/commercial photography.* Any person seeking the issuance of a permit for filming of a media broadcast (other than a news transmission), motion picture, or still commercial photography shall file a written application for permit with the Recreation Director or his/her designee on a form and within such time as shall be prescribed by the Recreation Director.

(3) *Recreational permits.* Any person seeking to reserve Park facilities for any event involving less than twenty-five people and not including the items covered in paragraph (d)(1)A., above, shall file a written application with the Recreation and Parks Bureau on a form and within such time as shall be prescribed by the Recreation Director.

(4) *Special facilities.* Any person seeking the issuance of a permit for use of Park property designated as a special facility shall file a written application for permit with the Recreation Director or his/her designee on a form and within such time as shall be prescribed by the Recreation Director.

(5) *Application fee.* For any activity described in this chapter, Section 741.03(d)(1), no application for permit shall be considered unless the applicant shall have paid at the time for filing an application for permit the required application fee in an amount in accordance with the schedule of fees set by the Recreation Director and approved by City Council.

(6) *Indemnification and reimbursement agreement.* No application for permit shall be granted unless the applicant shall have executed an agreement with the City, on a form to be prescribed by the Recreation Director, in which the applicant shall promise and covenant to bear all costs of policing, cleaning up and restoring the park upon conclusion of the event or activity; to reimburse the City for any such costs incurred by the City; and to indemnify the City and hold the City

harmless from any liability to any person resulting from any damage or injury occurring in connection with the permitted event proximately caused by the action of the permittee, the sponsoring organization, its officers, employees or agents or any person under their control insofar as permitted by law.

(7) *Security deposit.* For any activity described in this chapter, Section 741.03(d)(1)A., (d)(1)B. or (d)(1)D., no application for permit shall be granted unless the applicant has paid, within the time prescribed by the Recreation Director, the security deposit in an amount in accordance with the schedule of fees set by the Recreation Director and approved by City Council. The amount of the security deposit set in the schedule of fees shall be equal to the estimated cost of policing, cleaning up, and restoring the park upon the conclusion of the use or activity. The security deposit shall be deposited by the City into an escrow account. Promptly after the conclusion of a permit activity, the City shall inspect the premises and equipment used by the permittee.

A. If it is determined that there has been no damage to City property or equipment beyond reasonable wear and tear, the security deposit shall be refunded in full within thirty (30) days of the conclusion of the permitted event.

B. If it is determined by such inspection that the permitted event proximately caused damage to City property in excess of normal wear and tear and which requires repairs in excess of routine maintenance or determined that fines should be assessed against the permittee pursuant to this chapter, subsection (g), below, the City shall retain the security deposit or any portion thereof necessary to pay for the cost of repair or any fines assessed against the permittee. The Recreation Director or his/her designee shall give written notice of the assessment of damages or fine and retention of the security deposit to the permittee by personal delivery or by deposit in the United States mail, with proper postage prepaid to the name and address set forth in the application for permit. Any assessment of damages or fine in excess of the security deposit shall be paid to the City within ten (10) days after notice of such assessment of damages or fine is sent. Retention of all or a portion of a security deposit shall be subject to the appeal procedures contained in subsection (f), below.

(8) *Fees for use of park facilities.* No application for permit shall be granted unless the applicant has paid, within the time prescribed by the Recreation Director, a user fee and any other required fee in an amount in accordance with the schedule of fees set by the Recreation Director and approved by City Council. No application for permit shall be granted unless all required fees are paid as set forth herein.

(9) *Insurance.* Applicant shall procure and maintain at all times during its use of Park property, insurance in such amounts and with such coverages as shall reasonably be required by the City and shall name the City as an additional insured thereunder. The amounts and type of insurance

required shall be determined by the Public Works Department, based upon the nature of the activity and the risk involved. The Public Works Department shall prepare a uniform schedule of insurance guidelines for particular types of activities. Applicant shall provide the City with a certificate from an insurer evidencing such coverage prior to applicant's use of Park property, and within the time prescribed by the Recreation Director. The certificate shall also provide that the insurer shall give the City reasonable advance notice of insurer's intent to cancel the insurance coverage provided.

(10) *Permits not transferable.* No permit or preliminarily approved permit application may be transferred.

(e) *Processing of Application for Permits.*

(1) *Order.* Applications for permits shall be processed in order of receipt; and the use of a particular park or part thereof shall be allocated in order of receipt of fully executed applications accompanied by the application fee.

(2) *Conditional approval.* Applications for permits for activities or events which require insurance, approval or permits from other governmental entities, or compliance with other terms or conditions, will be reviewed and, if the application otherwise conforms to all other requirements, a conditional approval will be issued, if, within the time prescribed by the Recreation Director, any required fee or security deposit is not paid, or an insurance certificate evidencing the requisite insurance is not filed with the Public Works Department, or the approval or permit of other governmental entities has not been received, or the other terms and conditions have not been met, the conditional approval will automatically expire, the application for permit will be deemed denied and no written notice of denial will be required. For events or activities which involve the use of special facilities, or activities described in this chapter, Section 741.03(d)(1)A.3., 4., 7., 8., 9, or 10., above, all terms and conditions for issuance of the permit, including securing insurance and payment of all fees and security deposit, must be completed at least thirty days prior to the event unless a longer time period is prescribed by the Recreation Director.

No permit shall be issued unless all applicable fees and security deposit are paid within the times prescribed by the Recreation Director. Failure to pay fees or security deposit within that time shall cause the application to be deemed denied, without further notice to the applicant.

(3) *Written denials.* If no written denial or conditional approval is issued within fourteen days of the date on which a permit application is fully completed, executed and filed with the appropriate officer or employee, as designated by the Recreation Director, the application shall be deemed to have been granted a conditional approval pursuant to Section 6.6., above. Provided, however, the City may extend the period of review for an additional fourteen days by issuance of a written notice of extension. If, prior to the expiration of the extended review period, no written denial is issued, the application for permit shall be deemed to have been granted a conditional ap-

proval pursuant to subsection (e)(2), above.

(4) *Notice of extended review or denial of issuance of permit.* Written notice of denial or notice of extension shall be served on the applicant by personal delivery, or by deposit in United States mail, with proper postage prepaid, to the name and address set forth on the application for permit.

(5) *Contents of notice: grounds for denial.* Notice of denial of an application for permit shall clearly set forth the grounds upon which the permit was denied and, where feasible, shall contain a proposal by the City for measures by which the applicant may cure any defects in the application for permit or otherwise procure a permit. Where an application or permit has been denied because a fully executed prior application for the same time and place has been received, and a permit has been or will be granted to the prior applicant authorizing uses or activities which do not reasonably permit multiple occupancy of the particular area, the City shall propose an alternative place, if available for the same time, or an alternative time, if available for the same place.

To the extent permitted by law, the City may deny an application for permit if the applicant or the person on whose behalf the application for permit was made has on any prior occasion made material misrepresentations regarding the nature or scope of an event or activity previously permitted or has violated the terms of any prior permit issued to or on behalf of the applicant. The City may also deny an application for permit on any of the following grounds:

A. The application for permit (including any required attachments and submissions) is not fully completed and executed;

B. The applicant has not tendered the required application fee with the application or has not tendered the required user fee, indemnification agreement, insurance certificate, or security deposit within the times prescribed by the Recreation Director;

C. The application for permit contains a material falsehood or misrepresentation;

D. The applicant is legally incompetent to contract or to sue and be sued;

E. The applicant or the person on whose behalf the application for permit was made has on prior occasions damaged City property and has not paid in full for such damage, or has other outstanding and unpaid debts to the City;

F. A fully executed prior application for permit for the same time and place has been received, and a permit has been or will be granted to a prior applicant authorizing uses or activities which do not reasonably permit multiple occupancy of the particular park or part hereof;

G. The use or activity intended by the applicant would conflict with previously planned programs organized and conducted by the City and previously scheduled for the same time and place;

H. The proposed use or activity is prohibited by or inconsistent with the classifications and uses of the park or part thereof designated

pursuant to this chapter, subsection (a), above;

I. The use or activity intended by the applicant would present an unreasonable danger to the health, safety or welfare of the applicant, or other users of the Park, of City employees or of the public;

J. The applicant has not complied or cannot comply with applicable licensure requirements, ordinances or regulations of the City concerning the sale or offering of sale of any goods or services; or

K. The use or activity intended by the applicant is prohibited by law, by this Code and ordinances of the City, or by the regulations of the Recreation Director.

(6) *Amendment or revision of applications.* Any amendment or revision of an application or permit shall for purposes of determining the priority of the application for permit, relate back to the original filing thereof; but the time in which the City shall grant or deny the application for permit and serve notice of such granting or denial shall be computed from the date of the amendment or revision.

(f) *Procedures for Review; Waivers.*

(1) *Review by Director of the Department of Public Works.*

A. Any applicant who is denied a permit or denied a request for a waiver of user fee, security deposit, or certificate of insurance, or a permittee who has had all or a portion of its security deposit retained because it was assessed damages or a fine pursuant to this section may, within seven days of the service of notice of such determination, file a written appeal from such determination with the Director of the Department of Public Works;

B. The Recreation Director shall have seven days from the date on which the appeal was received in which to serve upon the applicant a notice that he/she has affirmed, modified or reversed the denial or retention of security deposit;

C. Such notice shall be deemed served upon the applicant or permittee when it is personally delivered or when it is sent by United States mail, with proper postage prepaid, to the name and address set forth on the application for permit;

D. If such notice is not served upon the applicant or permittee within seven (7) days of the date upon which the appeal was filed, then the denial or retention of security deposit shall be deemed reversed.

(2) *Form of appeals.* Any appeals filed pursuant to this section shall state succinctly the grounds upon which it is asserted that the determination should be modified or reversed and shall be accompanied by copies of the application for permit, the written notice of the determination of the City, and any other papers material to the determination.

(3) *Waiver of requirements.* Any requirements for a user fee, security deposits, or certificate of insurance shall be waived by the Solicitor's Office, if the activity is protected by the First Amendment of the United States Constitution and the requirement would be so financially burdensome that it would preclude the applicant from using Park property for the proposed activity. Fees for equipment and services shall not be

waived pursuant to this subsection. Application for a waiver of a user fee, security deposit, or certificate of insurance shall be made on a form prescribed by the Solicitor's Office and must include an affidavit by the applicant and sufficient financial information about the applicant to enable the Solicitor's Office to determine whether the requirement(s) would be so financially burdensome that it would preclude the applicant from using Park property for the proposed activity. If it appears that the applicant does not have sufficient funds to satisfy the user fee requirement prior to the proposed event, but that the applicant intends to raise sufficient funds at the event, the Solicitor's Office shall require the applicant to pay such user fee out of the proceeds of the proposed event. If no written denial is issued within fourteen (14) days of the date on which the application for such waiver is fully completed, executed and filed with the Solicitor's Office, the waiver request shall be deemed approved, contingent upon the applicant complying with all other permit requirements. Denials of requests for such waivers shall be subject to the appeal procedures contained in subsection (f)(2) hereof.

(j) *Violations and Penalties.* Any person who shall fail or refuse to perform any act, duty or obligation imposed by this chapter shall, upon conviction thereof, be sentenced to pay a fine not exceeding one thousand dollars ($1,000) and costs of prosecution, and in default of payment thereof, may be imprisoned for not more than 30 days. A separate offense shall be deemed committed on each day during or on which a violation or failure to comply occurs or continues.

(Ord. 02–10. Passed 4–16–02.)

741.04 FISHING IN KIWANIS LAKE.

(a) No person other than children under sixteen years of age shall fish in Kiwanis Lake, located in Farquhar Park. (1944 Code Ch. 20 § 11.)

741.05 PERMITTED ADVERTISING.

The Administration may sell advertising to be placed in Hoffman Field Numbers 1, 2 and 3. Memorial Stadium and the Municipal Ice Rink. The Administration, with the consent of Council by resolution, may designate additional public parks to receive advertising and promulgate rules and regulations governing all aspects of advertising to be placed within a designated public park. (Ord. 10–1987 § 2. Passed 5–5–87.)

741.99 PENALTY.

Whoever violates any provision of this article shall, on conviction, be fined not more than six hundred dollars ($600.00) and in default of payment thereof shall be imprisoned not more than five days. (Ord. 34–1989 § 1. Passed 3–21–89.)